*In re* J.H. *et al.*, Alleged to be Abused and Neglected Minors (The People of the State of Illinois, Petitioner-Appellee, v. Dale Mellinger, Respondent-Appellant).

Fourth District No. 4—98—0515

Opinion filed April 7, 1999.

COOK, J., specially concurring.

J. Brian Goldrick, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Arthur J. Feldman, Assistant Public Defender, of Bloomington, guardian *ad litem.*

JUSTICE GARMAN delivered the opinion of the court:

On June 2, 1998, the circuit court of McLean County entered a permanency review order pursuant to section 2—28 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1—1 *et seq.* (West 1996 & Supp. 1997)), changing the permanency goal for minors J.H. and K.H. from "return home" to "substitute care pending court determination." Respondent father, Dale Mellinger, appeals, arguing the evidence did not support a finding the Department of Children and Family Services (DCFS) provided services to him as required by the Act. Therefore, he asserts, the circuit court abused its discretion by finding such services had been provided and changing the permanency goal. We affirm.

## BACKGROUND

Respondent is the father of two children by respondent mother, Linda H. They are a son, J.H. (born August 14, 1991), and a daughter, K.H. (born August 27, 1992). Respondent and Linda never married. Linda had another child, C.W., by Grady W. Linda and Grady are not parties to this appeal.

On August 8, 1996, the State filed a petition for adjudication of wardship, alleging the three children were abused and neglected. The alleged abuse was an act of aggravated criminal sexual assault against K.H. committed by Grady. 705 ILCS 405/2—3(2)(iii) (West 1996). The allegation of neglect was based on Linda's failure to protect the children. 705 ILCS 405/2—3(1)(b) (West 1996). After a hearing, the children were placed in shelter care.

The goal stated in the initial service plan, filed September 18, 1996, was for the children to return home. The plan was revised on February 2, 1997. The goal remained the return of the children to Linda's home, but Mellinger's progress was rated unsatisfactory overall. The basis for this rating was that he had not been able to maintain stable housing long enough for the caseworker to implement any services. The caseworker noted Mellinger had expressed a desire to visit

the children on a regular basis, but he was prevented from doing so because of an order of protection prohibiting any contact between him and Linda, which also prohibited him from having contact with the children.

After a number of delays, an adjudicatory hearing was held on June 5, 1997. Linda stipulated to the allegation of neglect. The circuit court found the abuse by Grady proved by clear and convincing evidence, based on his having pleaded guilty to two counts of aggravated criminal sexual assault to K.H.

An updated service plan was filed on August 29, 1997. Mellinger's progress was again rated unsatisfactory because his housing situation remained unstable and he had not completed a drug and alcohol evaluation or domestic violence counseling. The goal remained to return the children to Linda's custody. Mellinger indicated at that time he would seek custody if Linda were to lose custody of the two children.

At the dispositional hearing on September 16, 1997, the circuit court entered an order stating that the permanency goal was the return of the children to Linda's home. The circuit court noted that the petition for adjudication of wardship contained no allegations directed at Mellinger; thus, no finding of unfitness was made with regard to him. Nevertheless, the circuit court placed Mellinger under an order of protective supervision and ordered him to cooperate with DCFS, undergo a substance abuse evaluation, submit to drug screening tests, and obtain an assessment and counseling related to domestic violence.

On March 17, 1998, a newly revised service plan was filed with the court. Mellinger's progress was again rated unsatisfactory. He had not complied with any of the plan objectives except visitation with the children. It was also noted that he visited inconsistently and had arrived "high" on marijuana at several visits. On November 25, 1997, he was charged with possession of drug paraphernalia after the police responded to a domestic violence call to Linda's home. The plan noted that the Baby Fold, the private agency assigned by DCFS to provide services to the parties in this case, had referred Mellinger to substance abuse, domestic violence, and sexual abuse programs, but he had not utilized any of these services. The goal remained "return home," but the agency referred the matter for internal legal screening.

At the permanency review hearing on June 2, 1998, the parties were informed that on June 1, 1998, the State filed a petition to terminate the parental rights of Mellinger, Linda, and Grady. 705 ILCS 405/2—29 (West 1996). The petition alleged, *inter alia*, that Mellinger failed to make (1) reasonable efforts to correct the conditions that led to the removal of the children and (2) reasonable progress toward their return. 750 ILCS 50/1(D)(m) (West 1996).

The sole witness at the permanency review hearing was Linda Polk, a child welfare specialist at the Baby Fold, who prepared the dispositional report filed on June 1, 1998. Polk was not questioned by the State about Mellinger. On cross-examination by counsel for Mellinger, she agreed that the statement in the dispositional report, in which she said Mellinger had not completed any service plan objective other than visitation, was inaccurate. Mellinger completed the recommended psychological evaluation in May 1997. Polk also acknowledged Mellinger completed parenting classes while in prison, but she stated these are not recognized by DCFS as acceptable classes. She explained this fact to Mellinger on several occasions. At the conclusion of cross-examination, the following exchange took place:

"Q. And did you ever inform Mr. Mellinger that it was no longer necessary for him to work on the Client Service Plan?

A. I told him that if he needed to continue working for himself on the plan because he needed to have the skills at the time of the legal screening, that we took the case for legal screening. But, yes.

Q. You told him to stop working on his Client Service Plan?

A. I told him it would not make a difference."

Following Polk's testimony, the circuit court asked for recommendations. The State replied:

"The goal of return home has not been achieved with any of these parents. All the services that were provided were appropriate. They were not successful. Reasonable efforts to achieve those goals were made; however, it doesn't appear that the agency adequately provided for the services, and, therefore, reasonable efforts were not made to facilitate the goal."

It is unclear which portion of the State's remarks referred to efforts by DCFS and the Baby Fold and which portion to efforts by any or all of the respondent parents. The State concluded with a recommendation that the goal be changed to "substitute care pending court determination."

Counsel for Linda made no argument. Counsel for Grady "concur[red]" with the State's comment that reasonable efforts had not been made to assist his client in attaining his assigned goals.

Counsel for Mellinger did not object to continued guardianship in DCFS, but argued the permanency goal should not be changed and the agency abused its discretion by advising Mellinger to stop working on his client service plan.

The guardian *ad litem* (GAL) did not make a recommendation. He did, however, state:

"I can say that I'm not really happy with the progress of any parent, but if the agency has not provided services, I don't know if we can go to a change of goal to substitute care if they haven't been

provided adequate services. Usually, we have a change of goal to substitute care when services have been provided but the people haven't taken full advantage of it."

The court initially declined to enter a permanency order, but was persuaded by counsel for Mellinger that it was necessary to do so. From the bench, the circuit court ruled:

"The court will reconsider and will enter a permanency order today with the recommendations as made by the State with the exception of the court will not make any fi[nd]ing as to the provision of services. I am not satisfied from what I've heard today that I've heard enough evidence on that, and we don't have time to delve into all the service plans and go into all the details. So, with the exception of that finding, I'll enter the permanency order."

Counsel for Mellinger again objected, arguing the court is required to make such a finding if a complete, valid, and appealable order is to be entered. The circuit court then called a recess to speak to counsel in chambers. Upon their return, the court stated:

"The court, after reviewing matters with counsel, will, in this case, enter a permanency order changing the goal to substitute care pending court decision with the other findings recommended[,] except that the court will find that services were provided, [and] were reasonably calculated to achieve the goal."

The court further explained its understanding that the agency is not required to continue to provide services after "there's a legal screening and the goal is internally changed within [DCFS]."

Ms. Webber (identified elsewhere in the record as a DCFS representative) commented that services to Grady and Mellinger "may have been shut off prior to that case review." She explained that legal screening was held, but the goal of "return home" was not changed at that time. According to Webber, services should continue to be provided to the respondent parents until the goal is changed by the court.

The court asked Polk to explain what had occurred in this case. She stated that a discussion took place within the agency as to whether, under the amended statute (705 ILCS 405/2—28 (West Supp. 1997)), the agency had the authority to designate a new goal and discontinue services based on that new goal. "So we left the old goal so that [at] the permanency hearing, that's when we would change it to the new goal."

In light of the most recent plan dated February 26, 1998, and the legal screening on March 17, 1998, the circuit court observed, "And after you had the legal screening without changing the plan, you basically changed the internal goal to substitute care[,] but that's not formalized anywhere."

Webber explained this was not permissible. According to her, to

change the goal from "return home" to substitute care, the agency is required "to write a new service plan reflecting what the new goal is and then setting forth objectives." Only after the goal is formally changed may the agency "omit any objectives for the parents except for visitation." Further:

"[W]hile Ms. Polk may have made a decision based on what happened at a legal screening, in order for the [ ] goal to technically [ ] have been changed, she would have had to develop a new Client Service Plan to document that. *** [T]he reason for that would be that, technically, the parents would have an opportunity internally, within DCFS, to appeal that change of the goal ***. Therefore, the service plan is part of [the agency's] announcement that something is changing."

In this case, the parties agreed, the original permanency goal of return home was set by the agency and the dispositional order of September 16, 1997, merely recognized that the goal set by DCFS was appropriate. The court commented that, under the law as it existed at that time, the court did not have the authority to set permanency goals, but could find DCFS abused its discretion in setting a goal. Given the confusion on this issue, the circuit court offered to continue the matter. The State responded:

"Your Honor, Ms. Webber is indicating that it's her understanding that had the private agency done this correctly, what could have been done is take the case to legal screening, made a decision the goal should now be substitute care, develop a new Client Service Plan and give[ ] it to all the parties[,] stating that was the goal. Under the old law, they still had the authority to do that without coming into court and asking the court to change [the goal]. It just didn't happen in this case."

The circuit court then made its final ruling:

"I will enter the order as previously indicated[,] finding that substitute care pending court determination is now the appropriate goal in this case. Under the confusing circumstances that I think are presented by the change in the law *** with the court now setting permanency goals ***, while it appears there may have been some misunderstanding or mix up here, the court is not going to enter a finding that the Baby Fold has not adequately provided for services. *** [T]he court, at any hearing on a Petition to Terminate, will hear that evidence in more detail. And certainly for any period of time that services may not have been provided or made available to any of the respondent parents, that, obviously, would not be held against them."

The written order was filed on June 4, 1998. It consists of a two-page checklist-type form. By filling in the blanks and checking certain

spaces on the form, the circuit court indicated its findings that the permanency goal of "return home" had not been achieved; services were provided; the services were appropriate but were not successful; the parties did not make reasonable efforts to achieve their goal; DCFS and the private agency adequately provided for the services and did make reasonable efforts to facilitate the goal; and DCFS and the private agency did not abuse their discretion. The order then indicated by means of a check mark which of the 11 listed permanency goals it was selecting: "SUBSTITUTE CARE PENDING COURT DETERMINATION ON PETITION TO TERMINATE PARENTAL RIGHTS."

## ANALYSIS

Before undertaking analysis of the issues raised on appeal, we express our concern with the almost 28-month interval between the removal of the children from parental custody and these proceedings. Although we appreciate the delays were due largely to Grady's incarceration and his several changes of counsel, the best interests of children are served by prompt hearings. As this court has previously stated, "Trial courts should be reluctant to grant continuances in such cases, and when a continuance is necessary, it normally should be for the shortest time possible." *In re S.H.*, 284 Ill. App. 3d 392, 394, 672 N.E.2d 403, 404 (1996).

As noted by the circuit court, relevant sections of the Act have recently been amended. In fact, they have been amended more than once. Because the question is likely to arise in subsequent cases, we address which amendment should be applied in this case, although the parties have not raised the issue.

■ Section 6 of the Statute on Statutes (5 ILCS 70/0.01 *et seq.* (West 1996)) provides:

"Two or more Acts which relate to the same subject matter and which are enacted by the same General Assembly shall be construed together in such a manner as to give full effect to each Act except in case of an irreconcilable conflict. In case of an irreconcilable conflict the Act last acted upon by the General Assembly is controlling to the extent of such conflict." 5 ILCS 70/6 (West 1996).

On May 22, 1997, final legislative action was taken on Public Acts 90—27, 90—28, and 90—87, each of which contained language amending section 2—28 of the Act. Pub. Act 90—27, § 30, eff. January 1, 1998 (1997 Ill. Laws 1437, 1480-85); Pub. Act 90—28, art. 10, § 10—20, eff. January 1, 1998 (1997 Ill. Laws 1498, 1565-70); Pub. Act 90—87, § 5, eff. September 1, 1997 (1997 Ill. Laws 2173, 2184-88).

Public Act 90—87 originated as Senate Bill 1099. Final legislative action occurred on May 22, 1997, at 2:01 p.m., when the Senate concurred in the House amendment and passed the bill. 90th Ill. Gen.

Assem., Senate Proceedings, May 22, 1997, at 3, 39, 41 (see also roll call vote on amendment as maintained by Illinois Senate Journal room). Public Act 90—87 replaced section 2—28 of the Act with two separate provisions—section 2—28 to apply to counties with a population of under 3 million and section 2—28.01 to apply to counties with a population of 3 million or more. The effective date of Public Act 90—87 was September 1, 1997.

Public Acts 90—27 and 90—28 originated as House Bills 66 and 165, respectively. Senate amendments to both bills were concurred in by the House on May 22, 1997. At 11:40 a.m., final legislative action on House Bill 165 occurred. 90th Ill. Gen. Assem., House Proceedings, May 22, 1997, at 4-20 (see also roll call 2 on Senate amendment as maintained by Illinois House Journal room). At 12:17 p.m., House Bill 66 was passed. 90th Ill. Gen. Assem., House Proceedings, May 22, 1997, at 31-37 (see also roll call 9 on Senate amendment as maintained by Illinois House Journal room). The amendments to section 2—28 of the Act in these acts may be read together to give full effect to each; however, they cannot be construed together with the provisions of Public Act 90—87 because they do not contain separate provisions distinguishing among counties based upon population. These acts were to have become effective on January 1, 1998.

■ We hold, pursuant to section 6 of the Statute on Statutes (5 ILCS 70/6 (West 1996)), the provisions of Public Act 90—87 with respect to section 2—28 of the Act took effect on September 1, 1997. Amendments to section 2—28 contained in Public Acts 90—27 and 90—28 could not take effect on January 1, 1998, because they conflicted with a later act of the General Assembly.

We note that the 90th General Assembly subsequently passed three additional pieces of legislation amending section 2—28 of the Act. Because the question is likely to arise in future cases, we address the effect of these legislative actions.

On May 18, 1998, final legislative action was taken on Senate Bill 363, the Juvenile Justice Reform Provisions of 1998 (I Legislative Synopsis & Digest, 90th Ill. Gen. Assem., Senate Bill 363, 1998 Sess., at 54, 59). This became Public Act 90—590, article 2001, section 2001—10 of which amends section 2—28 of the Act by making one very minor change to subsection (4)(c). Pub. Act 90—590, art. 2001, § 2001—10, eff. January 1, 1999 (1998 Ill. Legis. Serv. 1289, 1339-41 (West). However, section 2—28 of the Act as amended by Public Act 90—87, which was in effect at the time Public Act 90—590 was passed, does not contain a subsection (4)(c). The language that Public Act 90—590 purports to amend appears in subsection (5)(c). Compare 1998 Ill. Legis. Serv. at 1341 (West), with 705 ILCS 405/2—28(5)(c)

(West Supp. 1997) (as amended by Pub. Act 90—87). This attempted amendment was, therefore, ineffective.

The legislature next passed Public Act 90—655 (Pub. Act 90—655, eff. July 1, 1998 (1998 Ill. Legis. Serv. 1903 (West)), which originated as House Bill 1268, on May 21, 1998. I Legislative Synopsis & Digest, 90th Ill. Gen. Assem., House Bill 1268, 1998 Sess., at 725, 726. Section 156 of Public Act 90—655 amended both sections 2—28 and 2—28.01 of the Act. Pub. Act 90—655, § 156, eff. July 1, 1998 (1998 Ill. Legis. Serv. at 2385-86 (West)). This enactment was to become effective on July 1, 1998.

Before Public Act 90—655 took effect, however, the legislature again amended section 2—28 of the Act. On May 22, 1998, Senate Bill 1339 was passed (I Legislative Synopsis & Digest, 90th Ill. Gen. Assem., Senate Bill 1339, 1998 Sess., at 274, 278). It became Public Act 90—608, section 30 of which amended section 2—28 of the Act and section 32, *inter alia*, repealed section 2—28.01, effective June 30, 1998. Pub. Act 90—608, §§ 30, 32, eff. June 30, 1998 (1998 Ill. Legis. Serv. 1575, 1612-15, 1619 (West)).

We conclude that section 2—28.01 of the Act took effect on September 1, 1997, as a result of Public Act 90—87, and was repealed on June 30, 1998, as a result of Public Act 90—608. Section 2—28, as amended by Public Act 90—87, took effect on September 1, 1997, and, as amended by Public Act 90—608, took effect on June 30, 1998. The amendments contained in Public Act 90—655 never took effect.

■ In counties in which the population is less than 3 million, such as McLean County, section 2—28 of the Act requires periodic court review of the status of the minor. At these "permanency hearings," the court determines the future status of the child after making five determinations:

> "(i) the appropriateness of the permanency goal, (ii) the appropriateness of the plan to achieve the goal, (iii) the appropriateness of the services contained in the plan and whether those services have been provided, (iv) whether reasonable efforts have been made by all the parties to the service plan to achieve the goal, and (v) whether the plan and goal have been achieved." 705 ILCS 405/2—28(2) (West Supp. 1997) (as amended by Pub. Act 90—87).

Following the permanency hearing, the circuit court must enter a written order setting forth the future status of the minor (705 ILCS 405/2—28(3)(a) (West Supp. 1997) (as amended by Pub. Act 90—87)) and, if that status cannot be achieved immediately, the specific reasons therefor, including, *inter alia:*

> "(i) Whether the permanency goal is in the best interests of the minor, or whether [DCFS] abused its discretion in setting a goal that is not in the best interests of the minor.

(ii) Whether the services required by the court and by any service plan prepared within the prior 6 months have been provided and (A) if so, whether the services were reasonably calculated to facilitate the achievement of the permanency goal or (B) if not provided, why the services were not provided.

\*\*\*

(iv) Whether, because of any of the findings under subparagraphs (i) through (iii), [DCFS] should be ordered to set a new permanency goal or develop and implement a new service plan consistent with such findings." 705 ILCS 405/2—28(3)(b) (West Supp. 1997) (as amended by Pub. Act 90—87).

An order entered pursuant to this provision is immediately appealable as of right under Supreme Court Rule 304(b)(1) (155 Ill. 2d R. 304(b)(1)). 705 ILCS 405/2—28(3) (West Supp. 1997) (as amended by Pub. Act 90—87).

The circuit court, the parties, and the witnesses in this case were acting under the erroneous, but entirely understandable, belief that the proceeding was controlled by the version of section 2—28 contained in Public Acts 90—27 and 90—28. This version of section 2—28 listed eight alternative permanency goals, from which the court was required to choose the most appropriate. 705 ILCS 405/2—28(2)(A) through (2)(G) (West Supp. 1997) (as amended by Pub. Acts 90—27, 90—28). Had this version of section 2—28 been in effect, the circuit court would have been required to indicate in writing the reason the specific goal was selected and why the preceding goals in the list were ruled out. 705 ILCS 405/2—28(2) (West Supp. 1997) (as amended by Pub. Acts 90—27, 90—28). Further, this version of section 2—28 of the Act contained a list of seven factors the circuit court would be required to consider in addition to the factors listed above. 705 ILCS 405/2—28(2)(1) through (2)(7) (West Supp. 1997) (as amended by Pub. Acts 90—27, 90—28). These requirements, which were discussed in the briefs, do not apply to the instant case.

Having determined section 2—28 of the Act, as amended by Public Act 90—87, applies to the June 2, 1998, order of the circuit court that is the subject of this appeal, we now turn to the merits of the case. As a threshold matter, we address Mellinger's assertion that DCFS and the Baby Fold failed to provide services to him. He does not suggest he needed or requested specific services that were denied by the agencies, or that on-going services were terminated when Polk informed him he no longer needed to work on the goals set for him in the client service plan. His entire argument is based on the fact that no services were provided after the date on which Polk told him any further efforts on his part "would not make a difference."

■ At the hearing, the State, the circuit court, and the representatives from the agencies agreed Polk acted prematurely when she withdrew the offer of any further services to Mellinger. We, thus, need not determine the impact, if any, of the amended statute on internal agency procedures to conclude that, in this case, the agency acted improperly. We hold it is improper for the agency to communicate to a parent, prior to a formal change of the permanency goal, that no further services will be provided and no additional effort on his part will be availing.

### A. Circuit Court's Entry of Order Finding that Services Had Been Provided

■ Mellinger asks this court to apply an abuse of discretion standard to the circuit court's finding that appropriate services were provided to him. As the State correctly notes, in proceedings under other sections of the Act, this court has stated that, on appeal, we will not disturb the finding of the circuit court unless it is against the manifest weight of the evidence, citing *In re S.M.*, 223 Ill. App. 3d 543, 547, 585 N.E.2d 641, 644 (1992).

The exact date on which Polk advised Mellinger to abandon his efforts is not known. It was about the time of the most recent revision of the client service plan on March 17, 1998. By that time, more than 18 months had elapsed since the filing of the initial plan. Mellinger does not suggest that services were not made available to him during the 1½ years prior to March 1998, only that no services were provided between March and June 1998.

Mellinger argues that in reviewing the March 17, 1998, service plan and the testimony at the hearing, the circuit court "should have entered an order consistent with that information." In effect, he argues that the circuit court and, by extension, this court, may look only at the most recent plan, the goal stated therein, and the services provided in the interim, to determine whether appropriate services were provided. He offers no authority for this asserted limitation on the court.

The State acknowledges "there may have been some mix up in that regard in the last several months," but, because the case had been pending for so long, there was sufficient evidence before the circuit court from which it could conclude appropriate services were provided.

No case authority guides this decision. We held, above, that the agency acted prematurely. The record before the circuit court reveals, however, that services were offered and referrals made, but Mellinger did not avail himself of the services. The agency did not refuse any

request for services and did not withdraw any ongoing services. Thus, he was not prejudiced in any way by the improper action of the agency.

The circuit court was understandably reluctant to enter a finding in this situation, where the agency acted improperly. However, the finding was not against the manifest weight of the evidence, given an 18-month history of nonresponse and noncooperation with offered services.

## B. Circuit Court's Entry of Order Changing the Permanency Goal

■ Mellinger argues further that the circuit court abused its discretion by changing the permanency goal from "return home" to "substitute care pending court determination." He offers no authority for this suggested standard of review. We will apply a manifest weight of the evidence standard. *S.M.*, 223 Ill. App. 3d at 547, 585 N.E.2d at 644.

■ As we explained above, however, under the statutory language applicable to this case, the circuit court does not set the permanency goal but, rather, determines whether DCFS has abused its discretion in setting the permanency goal. 705 ILCS 405/2—28(3)(b)(i) (West Supp. 1997) (as amended by Pub. Act 90—87). In the present case, DCFS recommended that the circuit court change the goal to "substitute care pending court determination." We will review the judgment of the circuit court as if DCFS set the goal and the circuit court concurred.

■ Mellinger makes two arguments. First, he claims changing the goal was error because no services were provided to him between March and June 1998. We rejected this argument above. Second, he argues his position in the pending termination proceeding will be prejudiced because his efforts and progress will appear to be less than reasonable because of the premature cessation of services. As a result, he claims, the proper goal is "return home." The State responds it is premature for Mellinger to raise the issue of the possible outcome of the proceedings to terminate his parental rights. We agree that Mellinger will have the opportunity to make this argument to the circuit court in any termination proceeding.

We affirm the judgment of the circuit court, not because the proceeding strictly complied with the applicable version of the statute or because the agencies acted entirely properly. We affirm because Mellinger was not prejudiced by the premature withdrawal of services or the fact that all parties and the court thought the court, rather than DCFS, was required to select and set the permanency goal. Indeed, Mellinger declined the circuit court's offer to continue the matter and insisted the circuit court select a goal and enter an order

at the June 2, 1998, hearing. In addition, he made no discernable effort toward being reunited with his children for a period of 18 months. The circuit court proceeded carefully and with no precedent to guide it. The circuit court's acceptance of the goal recommended by DCFS was not against the manifest weight of the evidence.

Affirmed.

KNECHT, P.J., concurs.

JUSTICE COOK, specially concurring:

Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 747-48, 71 L. Ed. 2d 599, 603, 102 S. Ct. 1388, 1391-92 (1982). The supreme court struck down a provision of the Act that permitted termination of parental rights upon proof of two acts of physical abuse, each proved by a preponderance of the evidence. *In re Enis*, 121 Ill. 2d 124, 132, 520 N.E.2d 362, 366 (1988).

I am sympathetic with the desire to terminate parental rights quickly and efficiently in appropriate cases. I question, however, whether constitutional requirements are satisfied by a system that early on allows DCFS to select a goal of substitute care pending court determination on petition to terminate parental rights, when that determination is not based on clear and convincing evidence and is reviewable by the court only for an abuse of discretion. It appears that decision is the crucial decision in a termination of parental rights case. Once the decision is made to prevent the parent from having any contact with the child, it is inevitable that termination will be the eventual result. Nevertheless, respondent does not make that argument, and I concur in the decision to affirm.